IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 28, 2015 Session

## STATE OF TENNESSEE v. GLEN B. HOWARD

**Appeal from the Criminal Court for Hamilton County**
**No. 275593     Barry A. Steelman, Judge**

_____

**No. E2014-01510-CCA-R3-CD – Filed August 4, 2015**

_____

Defendant, Glen B. Howard, was indicted by the Hamilton County Grand Jury with five counts of rape of a child and one count of aggravated sexual battery. After a jury trial, Defendant was found guilty of four counts of rape of a child and one count of aggravated sexual battery as charged and one count of aggravated sexual battery as a lesser included offense of rape of a child. He was sentenced to an effective sentence of fifty years in incarceration. After a thorough review of the record, and in light of *State v. John J. Ortega, Jr.*, No. M2014-01042-CCA-R3-CD, 2015 WL 1870095 (Tenn. Crim. App. Apr. 23, 2015), we determine that Defendant's conviction for aggravated sexual battery as a lesser included offense of rape of a child was improper. We are unable to determine from the record whether the evidence supports a conviction for the next properly charged lesser included offense, child abuse. Consequently, we vacate the conviction for aggravated sexual battery. The remaining convictions and fifty year sentence are affirmed. Accordingly, the judgments of the trial court are affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in part, Vacated in Part and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Michael E. Richardson (at motion for new trial and on appeal), Chattanooga, Tennessee; Raymond T. Faller, District Public Defender; Mary Ann Green and Ted Engel, Assistant District Public Defenders (at trial), for the appellant, Glen B. Howard.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Neal Pinkston, District Attorney General; Charles D. Minor and Amanda Morrison, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

This is Defendant's direct appeal of his convictions and sentence of fifty years from the Hamilton County Criminal Court. This case arises from allegations made by the two female victims, N.J. and M.J.,[1] that Defendant, their mother's boyfriend, repeatedly sexually abused them.

## *Factual and Procedural Background*

J.B.,[2] the mother of the victims, met Defendant at Rob's, a bar near Chattanooga where Defendant was a frequent customer. They started dating. In October of 2007, J.B. and her daughters, at the time aged eight and six,[3] moved in to Defendant's two-bedroom apartment. Defendant worked as a maintenance person for the apartment complex, performing maintenance work in exchange for a free apartment. J.B.'s income provided for the rest of their necessities.

In April of 2008, J.B.'s work schedule changed significantly when she started working the third shift at Gold Bond. Defendant became the caretaker for the children, staying with them at night while their mother worked. Defendant was admittedly strict, helping J.B. to establish a list of rules for the children and a chart to monitor their compliance.

In December of 2009, after eating pizza for dinner, N.J. and M.J. told their mother that Defendant touched them inappropriately while she was at work. Defendant got down on his knees and claimed that he did nothing to abuse the children. He asked J.B. to take the children to the doctor. J.B. immediately left the apartment with the children.

---

[1] It is the policy of this Court to refer to victims of sexual abuse by their initials.

[2] We have chosen to refer to the mother of the victims by her initials to further protect the victims' identities. Additionally, at the time of incidents, the mother of the victims was named J.J. By the time of trial, she was married and went by the name J.B. For the sake of clarity, we have chosen to refer to her by her married name.

[3] N.J. was born October 12, 1999, and M.J. was born November 1, 2001.

J.B. took the victims straight to her mother's house. On the way there, J.B. attempted to get more information from the children about the extent of the abuse. M.J. claimed that she "was little and was just really scared to [say] anything." N.J. relayed to her mother that Defendant would "touch[ ] his privates on her privates, and that he would explode," using a towel to clean it up. J.B.'s stepfather called the police. J.B. provided the police with a statement and then took the children to the Children's Advocacy Center for a medical examination and interview.

As a result of the investigation that followed, Defendant was indicted by the Hamilton County Grand Jury in March of 2010 in a multi-count indictment for five counts of rape of a child in Counts One, Two, Three, Five, and Six; and one count of aggravated sexual battery in Count Four.

Both M.J. and N.J. testified at length and in explicit detail about their experiences and abuse during the time they lived with Defendant in the apartment. By the time the case went to trial, N.J. was 13 years of age and M.J. was 12 years of age. At the time of the abuse, N.J. was in second grade. The abuse started after her mother had been working the third shift for a few weeks. The first time Defendant touched N.J., they were watching television in Defendant's bedroom when he told her to "get undressed" and he started touching her by "moving his finger around on the outside of her lower privates." Then Defendant had N.J. lay down on the bed, and Defendant "put his privates on the outside of [hers]" and "moved up and down." Defendant was completely undressed at the time. Defendant asked N.J. to touch his penis, to "run it up and down," and told her to "put [his penis] in [her] mouth." She saw "the white stuff" come out "of his privates" onto her stomach; Defendant used a towel to wipe "the white stuff" off of her stomach. After Defendant finished wiping her off, he folded the towel and put it under the bed. N.J. stated that this occurred when she was in school and thought it was cold outside. N.J. stated that it felt "uncomfortable."

Another incident happened in N.J.'s bedroom where she and M.J. slept in bunk beds. Defendant climbed up onto the top bunk and "started touching [her] again in the lower area" with his finger.

Defendant woke N.J. on a school night as well. He told her to come into his bedroom. Once N.J. was in Defendant's room, he started touching her vagina with his fingers. After Defendant was finished touching her, N.J. got dressed and left the room. Defendant asked her to close the door on her way out.

N.J. testified to at least one instance where Defendant "tried to touch [her] on the inside [of her vagina] with his penis." Defendant got on top of her without his clothes. N.J. described that "it felt very bad, like it was not good. It hurt on the inside." She told him to stop and he stopped. She left the room then realized she forgot her socks. She

went back to Defendant's bedroom to get her socks and she "saw him standing on the right side of the bed and there's something on the computer . . . some lady, she was undressed." Defendant was "rubbing his penis." N.J. saw Defendant use the towel again for the "white stuff" that came out of his penis.

Yet another time, Defendant summoned N.J. to his room. This time, she kept her underwear on, and Defendant asked her to sit on the bed with her feet on the floor. Defendant was standing on the floor on the left side of the bed. Defendant told N.J. to open her mouth. He "stuck his penis inside [her] mouth." He "moved back and forth." N.J. said it was "nasty," and "[i]t didn't taste good." He took his penis out of her mouth. On this particular occasion, she did not see Defendant ejaculate.

N.J. testified that, every time Defendant touched her and ejaculated, he got out the towel from under the bed when he was finished. Defendant always used the same towel. He used the towel to wipe his semen off of her body "more than ten times." When he was finished with the towel he would place it back under the bed.

With regard to vaginal penetration, N.J.'s testimony was that "[s]ometimes but not all the time" Defendant would make her vagina "hurt on the inside." N.J. eventually told her mom about the abuse because she found out that Defendant was also abusing her sister. In all, N.J. estimated that Defendant touched her "more than twenty times."

M.J. also testified at trial. She recalled the first time Defendant touched her was during the nighttime when Defendant touched her "between [her] legs" on her "front bottom." M.J. was sleeping in her bed on the bottom bunk and awoke when Defendant shook her awake. Defendant touched her vagina inside her panties with his finger. Defendant "[stuck] his hand in [her] pants if [she] had pajama pants on." Defendant touched her on several occasions with his finger inside her panties, sometimes touching her on the inside of her vagina and sometimes touching her on the outside of her body. M.J. described one incident in Defendant's bedroom where he touched her inside her vagina. During one incident in the living room, Defendant asked her to take off her pants and panties. Defendant touched her vagina with his hand and moved his finger around in a circle on her vagina on the inside. M.J. testified Defendant touched her "many" other times in her bedroom and that he touched her for the last time on the night before they told their mother. During her interview at the Children's Advocacy Center, M.J. stated that it felt "not good" when Defendant touched her on the outside of her vagina and that it felt "bad" when he touched her on the inside of her vagina.

In December of 2009, J.B. left a twenty dollar bill taped to the refrigerator. The money was to pay for pizza. J.B. went to sleep so that she could get up in time to work the third shift. When Defendant got home, he was extremely disappointed to find a messy apartment. The twenty dollar bill was missing. Defendant was so upset that he

woke J.B. up from her nap. They argued about the behavior of the children. They located the twenty dollar bill and ordered a pizza. When they finished eating, they put the children to bed. Shortly thereafter, the children got out of bed, walked into the living room, and told their mother about the abuse. At the time, Defendant and J.B. were watching television. Defendant denied touching the girls. J.B. left with both children.

J.B. took the children to her mother's house where her stepfather called the police. J.B. provided the police with a statement. In it, she informed the police that there was a towel under Defendant's bed and it was not the towel she and Defendant used after they had sexual intercourse. The victims were taken to the Children's Advocacy Center for examinations.

At the Children's Advocacy Center, the girls were examined by Nurse Kathy Spada. The examination revealed no physical evidence which supported sexual assault or penetration. Nurse Spada did not testify at trial. Her medical reports were reviewed by Dr. Karla Garcia, a pediatrician at Children's Hospital at Erlanger Medical Center, the facility in charge of providing medical exams for the Children's Advocacy Center. Dr. Garcia testified as an expert in the area of sexual assaults regarding children. Defendant did not object to the introduction of the report itself into evidence. However, Defendant objected to the introduction of the "substantive findings or anything that may have been said to the examiner" as well as the "comments that are in the report which are attributed to the children" during the exam that appear in the report. The trial court allowed the report itself to be introduced under Tennessee Rule of Evidence 803(6) as a record of regularly conducted activity.

Dr. Garcia described the physical development of the two victims. She testified that N.J. was in "Tanner Stage 2"[4] and had not started her period but may have had some breast development, pubic hair, and hormonal changes in her vagina and hymen. The report indicated that M.J. was in "Tanner Stage 1." The report indicated that there was no sign of scarring or abrasion on the vaginal or anal opening of either N.J. or M.J. Despite normal examinations, Dr. Garcia testified that the possibility of sexual abuse or assault could not be excluded because "95 percent of children who have been sexual[ly] abused have absolutely normal exams."

Officer John Wright of the Red Bank Police Department investigated the allegations against Defendant. Defendant gave a statement in which he denied his involvement. The following night, Officer Wright went to Defendant's house and collected a towel from the laundry hamper. Defendant told Officer Wright that he

---

[4] Tanner Stages of development are used to measure physical development in children, adolescents and adults. The stages define physical measurements of development based on external primary and secondary sex characteristics.

ordinarily keeps that towel under his bed.  The towel was sent to the Tennessee Bureau of Investigation ("TBI") for analysis.

Mark Dunlap, a forensic scientist with the TBI, testified that DNA testing of the towel revealed several different locations on the towel that tested positive for sperm.  The towel tested positive for the presence of Defendant's DNA and sperm.  The testing excluded M.J. as a contributor of the DNA.  N.J., on the other hand, could not be excluded as a contributor of the DNA on the towel.

Defendant took the stand at trial and denied the allegations.  Defendant talked at length about the behavioral problems of the children at school and at home.  He explained that they addressed these problems by medicating at least one of the children and by establishing rules for the children to follow at home.  Defendant attempted to introduce medical records and school records of the children in order to show that, prior to moving in with Defendant, one of the girls had previously made a false claim about hearing loss and that one of the children was disruptive in school.  The trial court excluded this testimony as irrelevant.

Defendant explained that when J.B. and the girls first moved in with Defendant, J.B. did not work the third shift.  Defendant testified that the couple's sex life declined when J.B. started working the night shift.  Defendant claimed that he resorted to masturbation and pornography to fulfill his desires.  He explained that he would ejaculate on a towel and then place the towel under the bed.  Defendant could not explain how or why N.J.'s DNA could possibly be on the towel.

During the trial, it was revealed that J.B. had engaged in a threesome with her friend, Nancy Lane, and an ex-boyfriend, Mike.  At least one of the children walked in while the adults were engaged in sexual activity.  During Defendant's testimony, he explained that he found a CD containing pictures of J.B., Mike, and Ms. Lane in various sexual positions.  The CD was located near the family computer in a stack of CDs that the victims would have been able to easily access.   Defendant opined that the children could have seen the CD and the photographs on it.

Defendant called Dr. Martin Shapiro, an expert in statistics.  Dr. Shapiro testified that N.J's DNA could be present on the towel merely because she lived in the residence, as her DNA would have been all over the apartment.  Defendant also called Dr. Ronald T. Acton as an expert in forensic DNA analysis.  He examined the towel at issue and concluded that he could not "consistently conclusively state that [N.J.] contributed her DNA to that towel."

Defendant called several additional witnesses including Judy Cordell, a bartender, who testified that she had known Defendant for several years.  She indicated that she

trusted Defendant and had allowed him to come to her home to fix things. She also stated that Defendant had a reputation for truthfulness. Ms. Cordell also knew J.B., who she described as "a little promiscuous and she drinks quite a bit."

Defendant's former girlfriend, Rhonda Jones, testified that she frequently left her three children in Defendant's care. None of her children reported abuse. Defendant's friend Brittany Jones also testified as a character witness. She had known Defendant for about thirteen years and stated that he had never behaved inappropriately and that she would trust him around her children.

Nancy Lane testified that she had known Defendant for nine years and J.B. for fifteen years. Ms. Lane admitted that she smoked marijuana with J.B. and had at least one "three-way" with J.B. and her ex-boyfriend, Michael. This sexual encounter occurred at a trailer belonging to Michael. During the "three-way," one of the children, either M.J. or N.J., got out of bed and came in to the room. J.B. put the child back to bed and placed a lock on the outside of the children's bedroom door.

At the conclusion of the proof, the jury found Defendant guilty of rape of a child in Counts One, Two, Three, and Five.[5] Defendant was found guilty of aggravated sexual battery in Count Four as charged and in Count Six as a lesser included offense of rape of a child.[6]

The trial court held a separate sentencing hearing. At the hearing, the trial court sentenced Defendant to twenty-five years for each rape of a child conviction and to ten years for each aggravated sexual battery conviction. The trial court further ordered the sentences for the convictions for rape of a child in counts One and Five to be served consecutively and the remaining sentences to be served concurrently, for a total effective sentence of fifty years.

Defendant filed a timely motion for new trial. At this point, Defendant was represented by a different attorney than the one who had represented him at trial. In the motion, Defendant's new counsel argued the verdict was against the weight of the evidence, alleged ineffective assistance of trial counsel, challenged several evidentiary

---

[5] Count One charged Defendant with the vaginal penetration of N.J. Count Two charged Defendant with the oral penetration of N.J. Count Three charged Defendant with the digital penetration of N.J. Count Five charged Defendant with the digital penetration of M.J, which she described as the first time.

[6] Count Four charged Defendant with the aggravated sexual battery of N.J. Specifically, Count Four charged Defendant with the incident during which N.J. was in Defendant's bedroom watching television and using the computer and which occurred after Defendant asked N.J. a question. Count Six charged Defendant with the digital penetration of M.J. that occurred in the living room.

rulings, and claimed that Defendant received an excessive sentence. After the denial of the motion for new trial, this appeal followed.

*Analysis*

On appeal, Defendant raises the following issues for our review: (1) ineffective assistance of trial counsel; (2) the trial court erred by excluding the testimony of Nancy Lane; (3) the trial court erred by admitting the medical reports from the Children's Advocacy Center into evidence; (4) the trial court erred when it refused to allow the defense to ask questions about the victims' medical and school histories in order to discredit the victims; (5) the trial court erred when it refused to allow the defense to question Detective Wright about whether J.B. stayed with Defendant after the allegations of sexual abuse; and (6) whether the sentence was excessive.

*I. Ineffective Assistance of Counsel*

First, we address Defendant's claim for ineffective assistance of trial counsel. Ineffective assistance of counsel was first raised by Defendant in the motion for new trial. Specifically, at the hearing on the motion, appellate counsel for Defendant argued that his client would "eventually be filing a post[-]conviction petition for ineffective assistance of counsel" if he did not obtain success at the appellate court level. Appellate counsel discussed what he described as several "glaring" issues with respect to trial counsel's representation, including mistakes made by trial counsel during voir dire and the omission of the testimony of an expert witness, the pediatrician of the victims. Defendant did not present any witnesses at the hearing on the motion for new trial and did not present any proof to support his claim of ineffective assistance of trial counsel beyond argument of appellate counsel. The trial court denied the motion for new trial. In his brief on appeal, Defendant again addressed ineffective assistance of trial counsel, claiming that he was "severely prejudiced" by trial counsel's representation. This portion of Defendant's brief contains no citation to authority. Then, at oral argument, appellate counsel for Defendant explicitly waived this issue. Because Defendant explicitly waived this issue at oral argument, we will treat it as abandoned.[7]

*II. Evidentiary Issues*

Defendant raises several evidentiary issues on appeal. We will discuss each one in turn. To begin our analysis, we note that the admissibility of evidence is within the sound

---

[7] We note that this Court has repeatedly and emphatically stated that raising a claim of ineffective assistance of counsel on direct appeal is a practice "fraught with peril," *State v. Blackmon*, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001), because claims of ineffective assistance of counsel raised on direct appeal are reviewed under the same standard as those raised in post-conviction proceedings. *State v. Burns*, 6 S.W.3d 453, 461 n.5 (Tenn. 1999).

discretion of the trial court, and this Court will not interfere with the exercise of that discretion in the absence of a clear showing of abuse appearing on the face of the record. *See State v. McCoy*, 459 S.W.3d 1, 8 (Tenn. 2014); *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993). An abuse of discretion occurs when the trial court (1) applies an incorrect legal standard; (2) reaches an illogical or unreasonable decision; or (3) bases its decision on a clearly erroneous assessment of the evidence. *State v. Mangrum*, 403 S.W.3d 152, 166 (Tenn. 2013) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of delay, waste of time, or needless presentation of cumulative evidence. Tenn. R. Evid. 403.

### A. Testimony of Nancy Lane

First, Defendant argues that the trial court committed reversible error by excluding the testimony of Nancy Lane regarding a conversation she had with the victims after their accusations were disclosed. Ms. Lane claimed the victims told her that no one had "hurt" them. Defendant insists that the testimony was not hearsay because it would have proven the victims' state of mind; that it was admissible as an admission by a party opponent; and that he had a fundamental right to present the evidence. The State contends that the trial court properly limited the witness's testimony because it was inadmissible hearsay and Defendant did not have a constitutional right to present the evidence.

Ms. Lane was a trial witness for Defendant. Ms. Lane met J.B. fourteen or fifteen years prior to the time of trial. Ms. Lane and J.B. met when they were both working at Burger King. Ms. Lane met Defendant about nine years prior to trial through playing "darts." Ms. Lane was asked if she saw "these children after the allegations of sexual child rape." At that point, counsel for the State "objected to her saying whatever she's going to testify to about after this allegation came out." The following exchange occurred at a side bar conference:

Court: What is she going to say?

Counsel for Defendant: She saw the children at the Red Bank festival in April after this allegation. She asked the children if anyone had hurt them and they told her no.

Court: What do you say about that, [counsel for State]?

Counsel for State: I mean there's lots of context. I mean "hurt them" means - - I mean, "if anyone had hurt them" doesn't necessarily mean that someone wants to talk to somebody about some sort of, you know, being raped by somebody. I mean that's not something that people just commonly say, "Hey, yeah, I was raped last week." You know what I mean?

Court: That's not an evidentiary objection.

Counsel for State: I'm objecting to relevancy because it's not relevant.

Court: Well, whether they were hurt or not is relevant. That's the whole issue of the case.

Counsel for State: Right. But whether what they told her is not relevant in this particular matter because it doesn't prove or disprove anything. . . . I would also argue that it's hearsay, it's an out-of-court statement entered for the truth of the matter asserted.

Counsel for Defendant argued that they were not offering the testimony for the truth of the matter asserted, rather for the "fact that she had contact with the children." The trial court ruled that whether Ms. Lane had contact with the children was not relevant to any issue at hand and sustained the objection on both grounds—relevancy and hearsay.

Counsel for Defendant did not make an explicit offer of proof in the form of question and answer testimony by the proposed witness. An offer of proof is imperative to foster appellate review. *Alley v. State*, 882 S.W.2d 810, 815 (Tenn. Crim. App. 1994). While a narrative of excluded proof is not the best or encouraged method for an offer of proof, *see* Neil P Cohen, et al., *Tennessee Law of Evidence*, § 1.03 [5][d] (5th ed. 2005), a party may obtain relief based upon erroneously excluded evidence if "the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context." Tenn. R. Evid. 103(a)(2); *see Alley*, 882 S.W.2d at 815 (holding that as a general principle, an appellant must make an offer of proof of excluded evidence he seeks to have admitted unless its substance is otherwise apparent). In the case herein, counsel for Defendant explained the content of the excluded testimony to the trial court in narrative form. Thus, we determine the substance of the proposed testimony is apparent from the record such that we may review the issue on appeal.

As noted previously, the trial court excluded the testimony on two grounds—hearsay and relevance. We will address relevancy first, as evidence must be relevant to be admissible. Tenn. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

Defendant argued at trial that the proposed testimony was relevant to show that Ms. Lane had contact with the victims after the allegations of rape. We fail to see how the victims' contact with Ms. Lane, a person who was not a witness to the abuse and did not proclaim to have firsthand knowledge of the events at issue, was relevant to whether Defendant committed the offenses herein. We determine the trial court did not abuse its discretion in excluding the evidence on this basis.

Defendant also argues on appeal that the testimony offered by Ms. Lane fits squarely within several hearsay exceptions. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). In general, hearsay statements are inadmissible. Tenn. R. Evid. 802. Whether a statement constitutes hearsay and whether it falls under one of the exceptions to the hearsay rule "are questions of law subject to a de novo review." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015), *reh'g denied* (Tenn. Feb. 6, 2015).

Specifically, Defendant argues that the statements made by the victims to Ms. Lane fit within the state of mind hearsay exception. We disagree. Tennessee Rule of Evidence 803(3) provides the following as an exception to the general prohibition against hearsay: "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) . . . ." The Advisory Commission Comments to Rule 803(3) state "only the declarant's conduct, not some third party's conduct, is provable by the state of mind hearsay exception." Ms. Lane's proposed testimony—that the children told her that no one had "hurt" them—related to the conduct of Defendant, a third party, and was therefore not admissible under the state of mind hearsay exception. *See State v. Ramos*, 331 S.W.3d 408, 415 (Tenn. Crim. App. 2010) (holding that "the portion of the victim's hearsay statement in which she told her mother that 'it hurt' would have also been admissible as an 'existing state of mind, emotion, sensation, or physical condition' . . . however, the portion of the hearsay statement 'Jesus touch me here,' identifying a 'third party's conduct,' would not have been admissible under the state of mind exception"); *see also State v. Farmer*, 927 S.W.2d 582 (Tenn. Crim. App. 1996) (determining statement by declarant that the defendant planned to steal marijuana was inadmissible as proving conduct of third party).

Defendant also argues that the statements of the children qualify as an admission by a party opponent, a hearsay exception found in Tennessee Rule of Evidence 803(1.2). However, our supreme court has determined that a rape victim is not a "party" for purposes of the hearsay exception for party admissions. *See State v. Flood*, 219 S.W.3d 307, 314 (Tenn. 2007). Therefore, these statements were not admissible under any of the hearsay exceptions cited by Defendant. Defendant is not entitled to relief on this issue.

Defendant also claims on appeal that the exclusion of the statements made by the victims to Ms. Lane violated his right to present a defense. He cites *State v. Brown*, 29 S.W.3d 427 (Tenn. 2000), to support his argument. However, Defendant failed to raise this issue in the trial court. Since this argument is raised for the first time on appeal, it would ordinarily be deemed waived. *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996). However, because this issue relates to Defendant's fundamental right to a fair trial, we have chosen to examine the issue to determine whether plain error review is appropriate.

There are five factors that must be established before an error may be recognized as plain:

(a) the record clearly establishes what occurred in the trial court;

(b) a clear and unequivocal rule of law was breached;

(c) a substantial right of the accused was adversely affected;

(d) the accused did not waive the right for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283. The burden is on the defendant to persuade the appellate court that the trial court committed plain error and that the error was of "such a great magnitude that it probably changed the outcome of the trial." *Id.* (quoting *Adkisson*, 899 S.W.2d at 642); *see also* Tenn. R. App. P. 36(b) (relief may be granted when an "error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process"). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006).

In *Brown*, the defendant appealed the trial court's denial of his Rule 412 motion to present hearsay evidence of the minor victim's prior sexual behavior with another male "to provide the jury with an alternative explanation" for the tear in the victim's hymen. *Id.* at 429. The court first observed that the evidence was "clearly relevant to rebut the State's medical proof . . . and met the threshold admissibility standard of Tennessee Rule of Evidence 412." *Id.* at 434. The court then concluded that, despite the rule against hearsay, the evidence should have been admitted "to satisfy [the defendant's] constitutional right to present a defense." *Id.* at 436.

Our supreme court recognized that "[t]he Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense." *Brown*, 29 S.W.3d at 432 (citations omitted); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). In certain situations, "[t]he constitutional right to present a defense has been held to 'trump' the rule against hearsay . . . ." *Brown*, 29 S.W.3d at 433 (citations omitted); *see also Flood*, 219 S.W.3d at 316-17; *State v. Rice*, 184 S.W.3d 646, 673 (Tenn. 2006).

This right is not absolute, however, and where appropriate "must bow to accommodate other legitimate interests in the criminal trial process." *Chambers*, 410 U.S. at 295. "The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence." *Brown*, 29 S.W.3d at 433. In determining whether a defendant's constitutional right to present a defense has been violated by the exclusion of evidence, a reviewing court should consider whether: "(1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *Id.* (citing *Chambers*, 410 U.S. at 298-301).

The excluded evidence was not critical because the testimony from Ms. Lane that the children told her that no one had "hurt" them had little, if any, probative value, and the exclusion did not undermine any elements of Defendant's defense. *See U.S. v. Scheffer*, 523 U.S. 303, 315 (1998) (recognizing that an exclusion of evidence is unconstitutional when it "significantly undermine[s] fundamental elements of the accused's defense"). As we noted above, the issue of whether Ms. Lane had contact with the victims after their abuse was irrelevant to whether they were actually abused. Furthermore, the victims' statements to Ms. Lane that no one had "hurt" them is not the type of evidence that would be recognized as critical in this case. Assuming that the excluded statements have some probative value to rebut the victims' testimony that Defendant repeatedly abused them or to suggest that the children fabricated the events at issue, we conclude the statements are not clear enough to make the evidence critical to the defense under the facts and circumstances of this case. *See Chambers,* 410 U.S. at 303 ("Rather, we hold quite simply that under the facts and circumstances of this case the

rulings of the trial court deprived [the defendant] of a fair trial."). Certainly, the children could have interpreted the word "hurt" to mean that Ms. Lane was asking if they had been injured. Additionally, it is possible that the children did not understand that Ms. Lane was referring to Defendant's abuse when she asked if anyone had "hurt" them. The overwhelming testimony by the victims that described, in detail, the occasions on which Defendant raped and sexually abused them supports our conclusion that the excluded statement was not critical to the defense. *See Rice*, 184 S.W.3d at 673-74; *Rogers*, 188 S.W.3d at 614; *State v. Powers*, 101 S.W.3d 383, 396-97 (Tenn. 2003).

Moreover, the victims were available for cross-examination. Defense counsel could have asked the victims about the statements they made to Ms. Lane. If they denied making the statements, Defendant could have introduced the statements into evidence through Ms. Lane pursuant to Tennessee Rule of Evidence 613 as a prior inconsistent statement. Defendant had the opportunity to question the victims about the statements but did not do so. Generally, the right to present a defense is not denied when a defendant does not pursue a line of questioning during cross-examination. *Flood*, 219 S.W.3d at 318.

Next, we look at whether the statements bear some indicia of reliability. The victims made the statements to Ms. Lane under circumstances in which there were no incentives to be dishonest. However, the consideration of the reliability of a statement is limited by the amount of probative value that the underlying statements contain. In this case, while the statements appear to be reliable, they have little probative value to either implicate another perpetrator in the crime or to rebut the victims' claims that the abuse did in fact occur. We conclude that while the excluded statements contained some indicia of reliability, this consideration is not determinative of the admissibility of the victims' statement that no one had "hurt" them under the facts and circumstances of this case.

Finally, the interests supporting exclusion in this case are the same as the interests behind Tennessee Rule of Evidence 802, generally prohibiting hearsay. Consequently, we determine that the exclusion of the statements made to Ms. Lane did not violate Defendant's right to present a defense. *See Brown*, 29 S.W.3d at 433. Because a substantial right of the accused was not adversely affected, Defendant has failed to establish plain error and is not entitled to relief on this issue.

### B. Introduction of Reports from Children's Advocacy Center

Defendant complains that the trial court erroneously permitted the introduction of the two medical reports from the Children's Advocacy Center in Chattanooga. Defendant claims the reports contained hearsay within hearsay and violated the Confrontation Clause. Specifically, Defendant argues that because the author of the

reports, nurse Kathy Spada, did not testify and was not subject to cross-examination, the reports should not have been admitted. Additionally, he claims that the reports do not satisfy a hearsay exception because they were not for the purposes of medical diagnosis or treatment and the statements by the victims contained within the reports are hearsay. The State disagrees, arguing that the reports were compiled as a business record in the course of the Children's Advocacy Center's regularly conducted business. Further, the State argues the statements within the reports were used for the purposes of medical diagnosis and treatment. Moreover, the State insists that the statements made by the victims during the medical examination do not violate the Confrontation Clause because they were non-testimonial in nature.

At trial, the State called Dr. Garcia to testify about the medical exams given to the children at the request of the police department. The exams were performed at the Children's Advocacy Center by nurse Kathy Spada. Ms. Spada did not testify at trial. Instead, the reports were entered into evidence during the testimony of Dr. Garcia.

Defendant did not object to the introduction of the reports themselves into evidence; instead Defendant objected to the introduction of the "substantive findings or anything that may have been said to the examiner" as well as the "comments that are in the report which are attributed to the children" during the exam that appear in the report. The trial court allowed the report to be introduced under Tennessee Rule of Evidence 803(6) as a record of regularly conducted activity, otherwise known as the business records exception. Pursuant to that ruling, the trial court ruled that "the subjective findings of the examiner are admissible" because they were recorded "for a business purpose and it's part of a regularly conducted activity." We agree with this analysis. The testimony of Dr. Garcia supports this conclusion. The trial court did not abuse its discretion in admitting the report itself into evidence as a business record under Tennessee Rule of Evidence 803(6).

The trial court went on to determine the admissibility of the statements made by the victims that appeared within the report, the hearsay within hearsay. The trial court commented that:

> [E]ven under *Crawford v. Washington*, [124 S.Ct. 1354 (2004)] that because these statements [by the victims to the examiner during the exam] were for the purposes of medical diagnosis and treatment, that they would satisfy the Confrontation Clause. The key is whether the statement is considered to be testimonial, and if the statement is made to medical personnel for purposes of medical diagnosis and treatment, then the statement will be deemed to be non-testimonial, and therefore, will not violate *Crawford*.

-15-

And the Court is aware of the *State v. Cannon* case, [254 S.W.3d 287 (Tenn. 2008)]. In that case, the declarant's statements to medical personnel at the hospital that the declarant had been raped were not testimonial because those statements were for medical diagnosis and treatment, and it's clear to the Court from Dr. Garcia's testimony that this examination is in large part, if not totally, for purposes of medical diagnosis and treatment.

Dr. Garcia said, "We write verbatim what the child says to us because, quote, 'I need to know what went where how many times in order to be able to address the child's medical need.'" So the objection is overruled. The Court will allow the doctor to testify about the subjective findings of the examiner, because that would be appropriate under records of regularly conducted activity, and the Court has already ruled that that is what this is, and the Court will allow the comments in the report attributable to the children for the reasons just stated.

Tennessee Rule of Evidence 805 addresses hearsay within hearsay and provides: "Hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules or otherwise by law." In other words, it is not sufficient that the report was made as a business record during the course of regularly conducted activity; the statements of the victims contained within the medical report must also satisfy an exception to the hearsay rule. *State v. Rucker*, 847 S.W.2d 512, 516 (Tenn. Crim. App. 1992).

Tennessee Rule of Evidence 803(4) allows for the admission of hearsay in the form of statements for the purposes of medical diagnosis or treatment. The rule requires either that (1) the statement must have been made for the purposes of diagnosis and treatment, in effect describing medical history, past or present symptoms, or pain or sensations, or (2) the statement must address the cause or source of the problem if reasonably pertinent to diagnosis and treatment. *State v. McLeod*, 937 S.W.2d 867, 870 (Tenn. 1996). This hearsay exception is justified because "the declarant's motive of obtaining improved health increases the statement's reliability and trustworthiness." *State v. Barone*, 852 S.W.2d 216, 220 (Tenn. 1993). In addition, "if physicians or other medical personnel rely upon the statement in diagnosing and treating the patient, then the statement should be sufficiently trustworthy to be admissible in a court of law." *McLeod*, 937 S.W.2d at 870 (citing *Barone*, 852 S.W.2d at 220; *State v. Edwards*, 868 S.W.2d 682, 699 (Tenn. Crim. App. 1993)). Moreover, this Court has held that a child abuse victim's statement to a physician identifying a perpetrator is reasonably pertinent to diagnosis and treatment when the perpetrator is a member of the victim's immediate household because physicians have a duty to prevent an abused child from being returned to a place where he or she cannot be adequately protected from further abuse and because

-16-

such statements are relevant in diagnosing and treating the child. *State v. Rucker*, 847 S.W.2d 512, 518-20 (Tenn. Crim. App. 1992), *overruled on other grounds by McLeod*, 937 S.W.2d. at 870 n.2.

In order to determine the admissibility of a statement made by a child-declarant pursuant to Rule 803(4), the trial court is required to conduct an evidentiary hearing outside the jury's presence. *McLeod*, 937 S.W.2d at 869. When determining whether a child's statement qualifies for a hearsay exception under Rule 803(4), the trial court "must consider criteria such as the circumstances surrounding the making of the statement[,]" including "the timing of the statement and its contents[,]" whether "the statement was inappropriately influenced by another," whether the statement "was in response to suggestive or leading questions[,]" and whether there were any other factors that might "affect trustworthiness, such as a bitter custody battle or family feud." *Id.* at 871.

Here, the trial court properly held a jury out hearing regarding the admissibility of the victims' statements during the medical examination as recorded in the report from the Children's Advocacy Center, the hearsay within hearsay. We note that while Dr. Garcia did not perform the examination, her testimony revealed that she reviewed every report completed by the Children's Advocacy Center. After determining that the report itself satisfied the hearsay exception as a business record, the trial court also found that the statements within the report by the victims were given for the purposes of medical diagnosis and treatment and therefore fell within the hearsay exception in Rule 803(4). The trial court determined that the medical history and the physical examination of the victims were necessary in order to properly diagnose and treat the victims. Moreover, it noted that the appointments were close in time to the time period for the offenses alleged in the indictment, which increased the trustworthiness of the statements.

The victims in this case were eight and ten years old at the time of their medical examination. The timing of their statements, which was less than a month after the sexual abuse occurred, increased the reliability and trustworthiness of the statements. Dr. Garcia testified that the records were kept in the same manner in each examination and that the children who were examined were all asked similar questions in order to ascertain the extent of their abuse. While the objective observations made during the victims' medical examination did not reveal definitive proof of sexual abuse, Dr. Garcia testified that an overwhelming majority of child sexual abuse victims display no physical signs of abuse. The appellate record shows that Ms. Spada used the victims' statements to reach the diagnosis of "child sexual abuse."

The trustworthiness of the victims' statements could have possibly been brought into question by the victims suggested viewing of their mother engaged in a threesome with her ex-boyfriend and friend and/or their possible discovery of a CD of "adult"

-17-

pictures of the threesome. Counsel for Defendant did not attack the credibility of the victims or question them about the threesome or the CD of photographs. The record is devoid of any other type of evidence, such as a family feud or custody battle, that might affect the trustworthiness of the testimony. Accordingly, we conclude that the trial court did not abuse its discretion in determining that the report was admissible as a business record or that the victims' statements to Ms. Spada contained within that report were admissible under the hearsay exception in Rule 803(4) as statements for the purpose of medical diagnosis or treatment.

Finally, the trial court determined the statements made by the victims and contained within the report were non-testimonial, despite Defendant's argument that the admission of the statements within the reports violated Defendant's right of confrontation protected by the federal and Tennessee constitutions. *See generally Crawford v. Washington*, 541 U.S. 36 (2004); *State v. Maclin*, 183 S.W.3d 335 (Tenn. 2006); *see also State v. Dotson*, 450 S.W.3d 1, 62 (Tenn. 2014) (noting that the same standards govern both constitutions). We find this argument unpersuasive. The Confrontation Clause is not implicated where both victims testified at length at trial and could have been cross-examined about any statements contained within the reports.

## *C. Histories*

Defendant next insists that because the case "turned in large part upon the credibility of the two young victims," the trial court erred in refusing to allow Defendant to ask about prior medical records and school records of the victims. Defendant sought introduction of the medical records of N.J., showing that she had previously fabricated hearing loss, in an attempt to undermine her credibility. The State argues that the trial court properly denied the request to introduce the medical records because the probative value of the evidence was outweighed by its prejudicial effect.

Prior to trial, counsel for Defendant subpoenaed the medical records for N.J. from her pediatrician, Dr. Brent Morris. The records revealed that N.J. had previously reported a hearing loss in December of 2005, nearly three years prior to the allegations of abuse. The State filed a motion in limine to exclude those records. The defense wanted to introduce the records to show that the claim of hearing loss was falsified and made merely to garner attention. In other words, the defense wanted to use the records to question the victim's credibility.

At a hearing prior to trial, the trial court examined the medical records at issue. The trial court ruled as follows:

> The Court has heard that the defense would like to tell the jury in the opening statement that the alleged victim, [N.J.], complained of a hearing

loss that was not founded. The Court notes that the hearing loss was complained of on December 16th, 2005; that the complaints regarding sexual abuse were not reported until December 15 of 2009, which is almost to the day four years later.

At the time that [N.J.] complained of the hearing loss or inability to hear - - not loss but inability to hear, as it's noted - - [N.J.] was young. I'm looking for an age. 10-21-99 was her birthday. She was six years old.

. . . .

But with what I do have, I don't find that a report by a six-year-old of - - an occasional report by a six-year-old, within a month and a half of an earache with a high fever that later shows - - three months later shows that there was normal hearing during an evaluation shows that that child, that six-year-old child was dishonest about her inability to hear, nor do I find that the complaint about an inability to hear on occasion after she had had an earache within a recent period of time and after she had been tested to be normal and those results having come out some three months later, I don't find that that is very probative at all with regard to her complaining as a ten-year-old of having been sexually assaulted. So I don't find that these are relevant.

In the alternative, the trial court determined that the probative value was "slight" and that the probative value was substantially outweighed by the danger of unfair prejudice.

We determine that the trial court did not abuse its discretion in excluding the medical records. The trial court determined that a possibly false claim of hearing loss, made when the victim was approximately six years of age and several years prior to the allegations of sexual abuse, was irrelevant to the victim's testimony at trial and the ultimate issue of Defendant's guilt. We agree. Moreover, Defendant does not cite any authority on appeal that would bolster his argument that the trial court abused its discretion. After determining that the evidence was not relevant, the trial court was not even required by Tennessee Rule of Evidence 403 to weigh the probative value of the evidence against the danger of unfair prejudice. The medical records are not relevant and Defendant is not entitled to relief.

### D. Testimony of Detective Wright

Defendant also complains about the trial court's decision to limit the cross-examination of Detective Wright. The State insists that the trial court properly limited cross examination.

-19-

At trial, counsel for Defendant attempted to ask Detective Wright why he called Child Protective Services ("CPS") after the victims reported the sexual abuse. Defendant argues on appeal that Detective Wright would have testified that he made the call because he received information that Defendant and J.B. had been seen together after the report of sexual abuse. When the question was asked at trial, counsel for the State objected that the proposed testimony was hearsay. Counsel for Defendant failed to argue under which hearsay exception the testimony would be admissible. The trial court sustained the objection and ruled that the testimony was hearsay.

On appeal, Defendant contends that the evidence was not hearsay. In the alternative, he argues that even if the statement was hearsay, it was admissible to prove the state of mind of J.B and that, under *Brown*, he had a fundamental right to present the evidence. 29 S.W.3d at 432. As stated above, in determining whether a defendant's constitutional right to present a defense has been violated by the exclusion of evidence, a reviewing court should consider whether: "(1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *Id.* (citing *Chambers*, 410 U.S. at 298-301).

At trial, Detective Wright did not testify as to the identity of the declarant. Thus, we cannot conclude that the evidence was admissible to prove the state of mind of J.B. *See* Tenn. R. Evid. 803(3) (Advisory Comm'n Cmts.) ("The Commission contemplates that only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception."). Moreover, J.B. admitted at trial that she had contact with Defendant after the allegations of sexual abuse. In particular, she testified that she invited Defendant to her home to fix several items. She reported that he was at her residence for a short period of time. The evidence Defendant sought to introduce through Detective Wright was effectively introduced through J.B. Defendant is not entitled to relief on this issue.

### III. Aggravated Sexual Battery Conviction

Defendant was found guilty of aggravated sexual battery in Count Six as a lesser included offense of the indicted offense of rape of a child. Though not raised by either party on appeal, a panel of this Court recently held in *State v. John J. Ortega, Jr.*, No. M2014-01042-CCA-R3-CD, 2015 WL 1870095, at *10 (Tenn. Crim. App. Apr. 23, 2015), *no perm. app. filed*, that aggravated sexual battery is not a lesser included offense of rape of a child as a result of the amendment to Tennessee Code Annotated 40-18-110 and the explicit exclusion of part (b) of the test for determining lesser included offenses announced in *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999). *See also State v. Dallas Jay Stewart*, No. M2011-01994-CCA-R3-CD, 2013 WL 3820992, at *37 (Tenn. Crim. App.

Jul. 22, 2013), *no perm. app. filed.* Consequently, in *John J. Ortega, Jr.*, the defendant's conviction for aggravated sexual battery was modified to a conviction for child abuse, the next properly charged lesser included offense that was supported by the evidence. 2015 WL 1870095, at *11 (citing *State v. Swift*, 308 S.W.3d 827, 831-32 (Tenn. 2010)). This Court looked to Tennessee Code Annotated section 39-15-401(f), which specifically provides that child abuse may be a lesser included offense of "any kind of . . . sexual offense, if the victim is a child and the evidence supports a charge under this section." *John J. Ortega, Jr.*, 2015 WL 1870095, at *11.

In Count Six herein, the State elected the following factual basis for the charge of rape of a child: the digital penetration of M.J. which occurred in the living room. M.J. was born on November 1, 2001. The incident was, according to the indictment, alleged to have occurred between November 1, 2008, and December 31, 2009. The following lesser included offenses were presented to the jury: attempted rape of a child, aggravated sexual battery, attempted aggravated sexual battery, child abuse, assault, and attempted assault. Based on *John J. Ortega, Jr.*, the next properly charged lesser included offense in this case was child abuse; therefore, we must determine whether the evidence presented at trial was sufficient to support a conviction for child abuse.

According to Tennessee Code Annotated section 39-15-401, child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." T.C.A. § 39-15-401(a). Under the current statute, "if the abused child is eight (8) years of age or less," the offense is a Class D felony; otherwise it is a Class A misdemeanor. *Id.* This statute was amended on July 6, 2009. 2009 Tenn. Pub. Acts, c. 585, § 1. Prior to that date, the victim had to have been "six (6) years of age or less" in order for the offense to be a felony. *See* T.C.A. § 39-15-401(a) (2008). Pursuant to Attorney General Opinion 82-336, the amendment to Tennessee Code Annotated section 39-15-401 became effective forty days after the governor signed it. The amendment was signed on July 6, 2009; the effective date of the amendment is August 15, 2009.

From the record before this Court, we cannot find sufficient evidence to support a conviction for felony child abuse. The time period during which the abuse was alleged to have occurred—between November 1, 2008, and December 31, 2009—falls within a period of time during which the statute defining the felony offense of child abuse changed from requiring the victim to be six years of age or less (prior to August 15, 2009) to eight years of age or less (after August 15, 2009). M.J. turned eight on November 1, 2009. She did not testify as to specific dates on which the abuse occurred but did testify that Defendant touched her for the last time on the night before they told their mother, at which time she was eight years of age. The final episode of abuse is not the digital penetration that occurred in the living room referenced in Count Six. If that

-21-

incident occurred prior to August 15, 2009, then M.J. would have been too old to support a conviction for felony child abuse.

Moreover, the evidence is insufficient to support a finding of bodily injury. "Bodily injury includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(a)(2). The victim testified that when Defendant touched her on the inside of her "front bottom," it felt "bad," but the medical examination did not reveal any bruises, cuts, or abrasions. We are hard pressed to find that "it felt bad" equates to the injury required for child abuse.

Because the evidence is insufficient to support a conviction for child abuse, we look to the next charged lesser included offense to determine whether it is proper and whether the evidence at trial supports a conviction for that offense. The trial court charged defendant with both assault and attempted assault. As relative to this case, assault occurs when a person "[i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." T.C.A. § 39-13-101(a)(3). In light of the amendments to Tennessee Code Annotated section 40-18-110 defining lesser included offenses and our analysis in *John J. Ortega, Jr.*, we conclude that neither assault nor attempted assault are lesser included offenses of rape of a child. At least one other panel has concluded that assault is not a lesser included offense of rape under Tennessee Code Annotated section 40-18-110 as amended. *See State v. Cheyne R. Stewart*, No. M2014-00074-CCA-R3-CD, 2015 WL 2446753, at *11 (Tenn. Crim. App. May 22, 2015) (noting in the context of plain error analysis that "Defendant [could not show a clear an unequivocal rule of law was breached because he] cites to no legal authority supporting his contention that assault is a lesser included offense of rape, and no current legal authority supports his contention."). As there are no remaining properly charged lesser included offenses, we are left with no choice but to vacate Defendant's conviction for aggravated sexual battery in Count Six.

## IV. Consecutive Sentencing

Lastly, Defendant complains that the trial court improperly ordered his sentences to be served consecutively.

When a defendant challenges the length, range, or manner of service of a sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Only one of these criteria needs to exist in order to support the imposition of consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 859-62 (Tenn. 2013).

Our supreme court has recently held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations . . . . if [the trial court] has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *Id.* at 860, 862. Thus, the imposition of consecutive sentencing is subject to the general sentencing principles that the overall sentence imposed "should be no greater

than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" T.C.A. § 40-35-103(2) & (4). Further, "[s]o long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Pollard*, 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1) ("The order [for consecutive sentences] shall specify the reasons for this decision and is reviewable on appeal.")); *see also Bise*, 380 S.W.3d at 705.

In the case herein, the trial court found Tennessee Code Annotated section 40-35-115(b)(5) applied: that Defendant was "convicted of two (2) or more statutory offenses involving sexual abuse of a minor." The trial court considered the aggravating circumstances arising from the relationship between Defendant and victims, the nearly year-long time span of Defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual physical and mental damage to the victims. The court specifically noted that Defendant "took advantage of the trust that the children had in him [and] was a predator." The trial court also noted the lack of trust that at least one of the victims had in "all people" since the incident and the other victim's statement that it made her "worry for five years." The proof adduced from the trial, the sentencing hearing, and the presentence report support the trial court's findings. Accordingly, we conclude that the trial court did not abuse its discretion in imposing consecutive sentences.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed in part, vacated in part, and remanded. Specifically, the judgment for aggravated sexual battery in Count Six is vacated. The remaining judgments are affirmed.

_____
TIMOTHY L. EASTER, JUDGE